2024 IL App (1st) 232106

No. 1-23-2106

Opinion filed August 26, 2024.

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| In re M.G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22 JD 00555 |
| | ) | |
| M.G., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | Steve Bernstein, |
| | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, respondent M.G. was found guilty of the aggravated criminal sexual abuse of his 10-year-old niece S.G., ordered to register as a sex offender (see 730 ILCS 150/1 *et seq*. (West 2018)), and consequently he was adjudicated a delinquent minor pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq*. (West 2018)). On appeal, respondent contends that the State failed to prove him guilty beyond a reasonable doubt because

there was insufficient evidence that he touched the S.G.'s breast, or that he did so for the purpose of sexual gratification. Respondent also contends that his constitutional right to equal protection was violated because he received harsher treatment under the law due to his status as an "uncle" of the victim. We affirm.

¶ 2                                    BACKGROUND

¶ 3      Respondent was arrested in April 2019, after it was discovered that he had sexually abused his two biological nieces, S.G. (at age 10) and F.G. (at age 13), over the course of several months between August 2018 and December 2019, when respondent was ages 15 and 16. In the adjudication petition, the State subsequently charged respondent with the criminal sexual assault (Count 1) and aggravated criminal sexual abuse (Count 3) of his minor niece, S.G. and the criminal sexual assault (Count 2) of his minor niece, F.G. The State specifically alleged that during that time, M.G. "committed an act of sexual penetration upon S.G.," in that "he put his hand to the sex organ of S.G." (Count 1), and he knowingly "put his hand to [the] breast of S.G. for the purpose of [his] sexual arousal or gratification" (Count 3). See 720 ILCS 5/11-1.20(a)(3) (West 2018) (defining criminal sexual assault); 720 ILCS 5/11-1.60(b) (West 2018) (defining aggravated criminal sexual abuse). In addition, the State alleged that during that same period, respondent "committed an act of sexual penetration upon F.G.," in that he "put his hand to the sex organ of F.G." (Count 2). See 720 ILCS 5/11-1.20(a)(3) (West 2018) (defining criminal sexual assault).

¶ 4      At trial, the State adduced the following testimony by both S.G. and F.G. in support of those charges. S.G. testified in English and also in Spanish through an interpreter, while F.G. testified only in Spanish through the interpreter. In 2018, S.G. , F.G. and their immediate family (totaling five) moved from Mexico to their grandparents' two-bedroom apartment in the Chicago

suburbs. Also staying in this crowded apartment were the girls' aunt, respondent, their two grandparents, and their grandmother's cousin.[1] People slept in the two bedrooms and also in the living room.

¶ 5     At that time, S.G. and F.G., along with their two siblings, mom, aunt, and M.G. shared a bedroom, sleeping on the bed or on the floor. F.G. elaborated that whoever grabbed the bed first could sleep there, and S.G. also stated the sleeping arrangement was random. In early August 2018, S.G. and F.G.'s mother was hospitalized for several weeks.

¶ 6     S.G. testified that during this period and into 2019, respondent touched her "inappropriately," explaining that respondent touched her more than once while she and the others were sleeping in the bedroom, and always when she was on the floor. S.G. testified that respondent would start by touching her belly and then he would lower one hand (she was not sure which) under her pajamas and underwear to touch her vagina on the outside. At that point during S.G.'s testimony, the trial court stated, "I know it's hard, but you've got to talk about this[,] okay? Just relax," and later asked S.G. to talk "as loud as" she could. In Spanish, and presumably with the aid of an interpreter, S.G. clarified that respondent's hand "was never inside [her vagina]; it was always, like, on top, above." S.G. testified that she remembered one time distinctly because she was awake, although she did not think anyone else was, and it was dark at night. S.G. added in Spanish that, in that instance, respondent touched her "on the top part, the pubic area," in addition to her stomach. S.G. estimated that respondent committed the abuse more than five times, always touching her under her clothes. When it happened, she would go to the bathroom and close the door because that made her "feel safe." She would stay there "as long

---

[1]F.G. testified that eight people (which included herself) lived in the apartment, but S.G.'s testimony identifying individuals indicates it was 10 people.

as [she] had to," sometimes falling asleep on the bathroom floor, because she did not want to be near respondent.

¶ 7    Respondent also took S.G.'s hand and put it on his stomach, then attempted to move her hand lower to touch his penis, but she pulled her hand away. S.G. did not say anything when respondent touched her, nor did respondent make any sounds or say anything. S.G. would let respondent know she was awake by moving her body away from him. Although S.G. initially testified that this happened "just one time," in response to the State's question, S.G. later testified that it happened about five times. S.G. testified that she did not tell anyone about the abuse because her mother was in the hospital, she was scared to tell her older sister, and she did not have a close relationship with her grandparents. In fact, she felt scared and did not know what to do or who to talk to. She wondered why a member of her own family would touch her "like that."

¶ 8     Near the end of S.G.'s direct examination, the State noted that they had some "trouble with translation a little bit earlier," then stated, "when you spoke to the interpreter, we talked about parts of your body that the minor Respondent touched. Can you tell me those parts again, please? Which parts of your body did he touch?" S.G. asked if she could respond in Spanish, which was allowed, and she testified, "[m]y vagina, my breasts, and sometimes my belly."

¶ 9    On cross-examination, S.G. clarified that the abuse occurred one or two times when her mother was also present in the bedroom. The defense proposed that during her forensic interview conducted after reporting the abuse, S.G. had identified a different person, "Miguel Cruz Oliveras," as the uncle who "did all the touching," but S.G. denied that assertion. She also denied that two uncles resided in the apartment; instead, one was "like a cousin" of her grandmother's,

4

not an uncle. However, he slept in the other bedroom.[2] On re-direct examination, S.G. explained that she knew it was respondent who touched her, even though it was dark, because he was the only person sleeping next to her.

¶ 10    F.G. testified next that one night in August 2018, while her mother was hospitalized, M.G. lay between F.G. and another person on the bed. Respondent touched F.G.'s stomach and then lowered his right hand under her shirt, pants, and underwear to touch her "intimate parts," by which she meant her vagina "within the lips." Respondent touched her for about five minutes. Respondent did not say anything or make any sounds. F.G. moved her body so that respondent would know that she was not fully asleep. F.G. thought that maybe it was a dream because she was half asleep, but when she awoke, she knew "something bad had happened," and she did not feel safe. F.G. explained that she did not understand what was happening to her because she was very young and respondent was a family member. F.G. did not tell anyone about it at first because she feared they might not believe her and because her mother was absent at the time.

¶ 11    In 2019, the family moved to a shelter, but returned to their grandparents' home in 2020. By then, they had different sleeping arrangements, and M.G. did not sleep in the same room with S.G. or F.G. In 2021, S.G. divulged to her sister what had happened, and F.G. also eventually told S.G. about the abuse incident. The family moved from their grandparents' home into their own home in June or July 2021. In 2022, the sisters then told their mother of the abuse. F.G. explained that they decided to tell their mother because respondent was potentially going to live with them. Afterwards, the sisters reported the matter to the police and also spoke a forensic interviewer. At trial, both S.G. and F.G. made in-court identifications of respondent.

---

[2]F.G. also stated on cross that "[a] cousin of my mom's" stayed in the other bedroom.

¶ 12 On cross, F.G. acknowledged telling the forensic interviewer that she was asleep when M.G. touched her. She thought the incident with M.G. was a dream until S.G. reported her own abuse. On re-direct, F.G. confirmed that she knew it was not a dream because when she awoke the next day, she knew something bad had happened, and because her sister's report corroborated the matter. F.G. further stated that she knew M.G. was the perpetrator because they slept in the same bed that night, and she saw him before she went to sleep and when she awoke in the morning.

¶ 13 The State rested, and the defense moved for a directed verdict, which was denied. The respondent rested without presenting evidence, and the parties presented closing arguments. The defense argued the victims conspired in their reporting of the abuse and there was no evidence of penetration or sexual gratification to sustain the counts. The defense did not raise any constitutional issue.

¶ 14 Following evidence and argument, the court issued the following findings. Regarding F.G., the court was convinced that sexual abuse occurred, but found the State failed to establish beyond a reasonable doubt the offense of criminal sexual assault. The court specifically found F.G.'s testimony was weak because she was trying to "protect her mom" and thus "couched her testimony in such a way" that it was simply insufficient to satisfy the State's burden. The court stated, "[F.G.] did everything in her power to make it seem as if it didn't happen for her own well-being and for her mother's well-being."

¶ 15 Nevertheless, as to S.G., the court found her testimony "very credible" and there was "[n]o question" that S.G., at 10 years old, was sexually abused by her uncle in violation of her trust. The court noted S.G. was so frightened by the abuse that she had to leave the room and hid in the bathroom. The court found that the abuse took place multiple times and, contrary to the

defense argument, denied that F.G. or S.G. conspired against respondent in reporting the sexual abuse. The court thus determined the evidence established beyond a reasonable doubt that respondent was guilty of both the criminal sexual assault and aggravated criminal sexual abuse of S.G. Accordingly, the court adjudicated respondent delinquent for those crimes and placed him on electronic monitoring.

¶ 16     Respondent filed a motion to reconsider that finding, again contending the State failed to establish beyond a reasonable doubt evidence of penetration to sustain the criminal sexual assault of S.G. Respondent also maintained there was no evidence that he touched S.G. for the purpose of sexual gratification to sustain the aggravated criminal sexual abuse offense.

¶ 17     After hearing arguments and again reviewing the evidence, the court reversed its decision on Count 1, and found respondent not guilty of criminal sexual assault. The court reiterated that although it believed both victims as to the abuse, the evidence of penetration needed for criminal sexual assault was insufficient. However, the court sustained its guilty finding as to the aggravated criminal sexual abuse of S.G., Count 3, first reiterating that S.G. was a very credible witness, and respondent's intent was clear. The court declared that, considering the totality of the facts, including the "time of the day, the location of the touching, the fact that [respondent] did, in fact, touch under two layers of clothing," there was no doubt that respondent touched S.G. "for his and/or her sexual gratification."

¶ 18     The court thus upheld its delinquency finding on Count 3, and as respondent was about to turn 21, the court lifted the electronic monitoring, mandated DNA testing, and ordered respondent to register as a sex offender.

¶ 19     This appeal followed.

¶ 20                                        ANALYSIS

7

¶ 21                            *Sufficiency of the Evidence Claim*

¶ 22    When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, we must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). In that sense, our function is not to retry the defendant or substitute our judgment for that of the trier of fact. *Id*. Rather, the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id*. This same reasonable doubt standard applies to juvenile delinquency proceedings. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 47.

¶ 23    In this case, as set forth, respondent was found guilty of aggravated criminal sexual abuse. According to section 11-1.60(b) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.60(b) (West 2018)), "[a] person commits aggravated criminal sexual abuse if that person commits an act of sexual conduct with a victim who is under 18 years of age and the person is a family member," which is a Class 2 felony. *Id*. The term sexual conduct "means any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2018). Respondent does not now challenge his status as a "family member" of the victim S.G. or that S.G. was a minor under the statute. Rather,

respondent contends the State failed to prove he committed an act of "sexual conduct" against S.G. by touching her breast or that he did so for "the purpose of sexual gratification or arousal." See *id*.

¶ 24    Here, contrary to respondent's contention otherwise, S.G. testified competently that from August 2018 and into 2019, respondent repeatedly touched S.G.'s vagina, breasts, and sometimes her belly. She explained that in the evening while they were sleeping on the floor in a room full of her immediate family members and aunt, respondent would start by touching her belly and then reach under her pajamas and underwear to touch her vagina on the outside. Respondent committed this abuse at least five times and while S.G.'s mother was hospitalized, making S.G. so scared and uncomfortable that she would retreat to the bathroom, where she'd sometimes fall asleep on the floor with the door closed. Respondent also tried to guide S.G.'s hand to his penis about five times before she pulled her hand away. S.G. did not tell anyone of the abuse because her mother was in the hospital, she was not close to her grandparents, and she felt scared. The court found S.G. "very credible" and there was no doubt that her uncle sexually abused her multiple times her when she was 10 years old. Given the court's credibility finding and viewing this evidence in a light most favorable to the State, as we must, we cannot say the evidence was so improbable or unsatisfactory as to create a reasonable doubt of respondent's guilt. See *Wright*, 2017 IL 119561, ¶ 70.

¶ 25    Respondent nonetheless maintains the evidence "suggests that S.G. thought or dreamed" the abuse and, specifically, the touching of her breast. Respondent's argument is not well-taken. First, it's clear from S.G.'s testimony that to the extent she was sleeping when the abuse occurred, it awakened her; again, S.G. reported that the abuse occurred more than five times and

on multiple occasions she escaped to the bathroom to get away from respondent.[3] Second, S.G. testified that she specifically remembered one time distinctly because she was awake (she stated "I just remember one time happening like, because I was like not really sleeping," in which she referenced respondent touching her stomach and public area, which includes her vagina).[4] Third, in response to the State's questioning, S.G. testified confidently and competently in her native language of Spanish that respondent touched "[m]y vagina, my breasts, and sometimes my belly," thus clarifying the nature of the abuse. While respondent asks that we read the testimony and inferences arising from the evidence in a light most favorable to him, that is not the standard on appeal. Rather, it's the opposite. See *Sutherland*, 223 Ill. 2d at 242. We will not retry respondent or substitute our judgment for that of the trial judge, especially as to matters involving witness credibility and the weight of the evidence. See *id.*; *Wright*, 2017 IL 119561, ¶ 70.

¶ 26    Respondent also argues the State failed to prove beyond a reasonable doubt his identity, suggesting the perpetrator could have been any one of the other people in the crowded apartment, including S.G.'s grandfather, her grandmother's cousin, or her then seven-year-old brother. See *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989) (listing relevant factors to consider in identification challenges). Yet, respondent does not challenge S.G.'s testimony as to the sleeping arrangement — that S.G. and respondent shared a bedroom with S.G.'s three siblings, aunt, and mother (when she was present). The only other two adult males slept in different rooms. While the defense suggested on cross that S.G. identified a different "uncle" ("Miguel Cruz Oliveras") as the abuser, S.G. denied that assertion and denied that she even had two uncles in the

---

[3]We agree with the State that S.G. never testified she believed the abuse was a "dream." That was F.G. who did so. Respondent appears to be conflating their testimony.

[4]We decline respondent's invitation to view this statement in isolation without considering S.G.'s total testimony and the context in which she made her statements.

household; rather, one was similar to a cousin of her grandmother. Respondent did not contradict S.G.'s statements or further perfect his impeachment.[5] The record thus does not support his claim. See *People v. Hunt*, 234 Ill. 2d 49, 58 (2009) (noting, the appellant bears the burden of presenting an adequate record to support his claim of error, and any doubts stemming from an inadequate record will be construed against the appellant). Moreover, a trier of fact is not required to accept any possible explanation compatible with the respondent's innocence and elevate it to the status of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009); see also *People v. Newton*, 2018 IL 122958, ¶ 27 (noting, the State need not disprove or rule out all possible factual scenarios).

¶ 27    Significantly, S.G. testified that respondent sexually abused her multiple times and she knew it was respondent, notwithstanding the dark room, because he was the only person sleeping next to her at the time. Again, the abuse prompted her to flee to the bathroom multiple times. It is well established that a single positive identification by a witness who had ample opportunity for observation is sufficient to support a conviction. *People v. Davila*, 2022 IL App (1st) 190882, ¶ 36; see also *People v. Wells*, 2019 IL App (1st) 163247, ¶ 19 (unequivocal testimony from a single complainant, even absent corroborating physical evidence, is sufficient to sustain a conviction in a sexual crimes case). The persuasiveness of identification testimony likewise continues to be strengthened by the witness's prior acquaintance with the accused. *Davila*, 2022 IL App (1st) 190882, ¶ 38. Given the familial relationship between respondent and S.G., the sleeping arrangements, and competent testimony by S.G., including her attention to the abuse, it

---

[5]When defense counsel asked S.G. whether she'd identified another individual in the forensic interview, and S.G. denied that suggestion, counsel stated "Judge, I'll come back to that. I'll look up the video." It is not entirely clear from the record what video defense counsel is even referencing. See *People v. Hunt*, 234 Ill. 2d 49, 58 (2009).

was reasonable for the trial court to find S.G. positively identified respondent as her abuser. See *Sutherland*, 223 Ill. 2d at 242.

¶ 28    Notably, F.G. also identified respondent. While the trial court found the evidence was insufficient to establish the criminal sexual assault of F.G. beyond a reasonable doubt, the court expressly found F.G.'s testimony credible. Consistent with the abuse against S.G., respondent touched F.G.'s stomach and then lowered his hand under multiple layers of clothing to touch her "intimate parts," by which she meant her vagina, for about five minutes. Thus, it was more likely than not that respondent committed criminal sexual assault against F.G. See 720 ILCS 5/11-1.20(a)(3) (West 2018) (defining criminal sexual assault); *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 74 (noting, other-crimes evidence is admissible when a jury can reasonably find by a preponderance of the evidence that the defendant committed the other offense). Moreover, the trial court dismissed the defense's claim that S.G. and F.G. conspired in their identification of defendant, and both witnesses made in-court identifications of defendant. F.G.'s identification thus buttresses S.G.'s identification.

¶ 29    Lastly, while respondent equates the delay in outcry with a lack of identification, this argument is misplaced. A delay in reporting incidents of sexual abuse may be reasonable where the victim's silence can be attributed to fear of the offender or to shame, guilt, and embarrassment. *People v. Duplessis*, 248 Ill. App. 3d 195, 199 (1993). In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry. *Id*. at 199-200. Again, S.G. testified that she did not tell anyone about the abuse because her mother was in the hospital, she was scared to tell her older sister, and she did not have a close relationship with her grandparents. In fact, she testified she felt scared and did not know what to do or who to talk to. The two sisters ultimately reported the abuse to their mother about three

years later when it became clear that respondent would potentially live with them in their home. The record also suggests that even four years later at trial, S.G. struggled to speak about the abuse. Under these circumstances, it was reasonable to conclude the delayed outcry was a result of the sexual abuse the respondent perpetrated against S.G. at her young age of 10 while her mother was hospitalized, and S.G.'s concomitant fear, shame, and guilt, *rather than* any inability to identify respondent as the offender. Respondent's argument fails.

¶ 30    Respondent next argues that the State did not prove that the touching was done for the purpose of sexual gratification or arousal, an essential element of aggravated criminal sexual abuse. See 720 ILCS 5/11-1.60(b) (West 2018). We disagree.

¶ 31    Determining whether an act was committed for the purpose of sexual gratification or arousal, as defendant acknowledges, is typically inferred from circumstantial evidence. *People v. Hunter*, 2023 IL App (4th) 210595, ¶ 58. Circumstantial evidence of sexual gratification may include the removal of clothing, heavy breathing, placing the victim's hand on the accused's genitals, an erection, or other observable signs of arousal. *In re M.H.*, 2019 IL App (3d) 180625, ¶ 17. "[T]he issue of intent of sexual gratification in minors must be determined on a case-by-case basis," and there's no bright-line test. *In re Matthew K.*, 355 Ill. App. 3d 652, 656-57 (2005). A fact finder must consider all of the evidence, including the offender's age, maturity, actions, and statements, before deciding whether intent can be inferred. *Wells*, 2019 IL App (1st) 163247, ¶ 19; *M.H.*, 2019 IL App (3d) 180625, ¶ 17.

¶ 32    Here, the nature of the touching and the circumstances under which it occurred provide strong circumstantial evidence of intent. Respondent, at ages 15 and 16, waited until S.G.'s mother was away and the rest of his family was presumably asleep, then proceeded to touch his 10-year-old niece's intimate parts, including her breast, under her pajamas and underwear. See

*People v. Burton*, 399 Ill. App. 3d 809, 815 (2010) (touching a female's breast generally carries a sexual purpose). While respondent argues that the lack of sexual sounds and words suggest a lack of intent, we again decline to read the evidence and inferences arising therefrom in a light most favorable to him, rather than the State. Instead, the trial court could have easily concluded that respondent made no sounds or noises to ensure that the rest of his family would not awaken, and that no attention would be drawn to himself in order to take advantage of the situation. As the trial court declared, considering the totality of the facts, including the "time of the day, the location of the touching, the fact that [respondent] did, in fact, touch under two layers of clothing," there was no doubt that respondent touched S.G. "for his and/or her sexual gratification." Given that finding, we therefore reject respondent's contention that *he was asleep* when touching S.G. and could not have intended sexual gratification. Respondent's repeated sexual abuse of S.G. (and his abuse of F.G.) also negates any claim that this contact was unintentional or accidental.

¶ 33     We further reject respondent's reliance on *In re Matthew K.* There, the 12-year-old respondent touched his 8-year-old sister's vagina and kissed her with his tongue, then lifted her shirt and gave her a belly massage while playing a game called "survival." The State also presented expert testimony from a child psychiatrist that the respondent was socially immature, acting at the level of a 10-year-old, and there was no evidence the respondent was sexually gratified or attempted to sexually gratify himself or the victim. Over a dissent, this court reversed the trial court's delinquency finding of aggravated criminal sexual abuse after finding the State's evidence insufficient to establish that the respondent acted with the purpose of sexual gratification.

¶ 34    This case is distinguishable in significant regards. Here, respondent was ages 15 and 16 when he abused his 10-year-old niece. Indeed, the closer the accused is to the age of majority, the more plausible it is for the court to infer that the accused acted for the purpose of sexual gratification or arousal. *M.H.*, 2019 IL App (3d) 180625, ¶ 17. There also was no expert evidence that respondent was *not* sexually gratified when abusing S.G. or that he was socially immature for his age. In fact, the record suggests otherwise. By the time of the guilty finding in October 2023, respondent had graduated high school, had a full-time job, and paid rent to his parents. See *In re Kendale H*., 2013 IL App (1st) 130421, ¶ 31 (noting, we may affirm the lower court on any grounds supported by the record). Moreover, as set forth, this was not a one-time childish exploration from curiosity. Respondent's repeated abuse of S.G. and his abuse of F.G. negates his claimed lack of intent.

¶ 35    Based on the foregoing, the State proved beyond a reasonable doubt that respondent committed aggravated criminal sexual abuse because he committed an act of sexual conduct, insofar as he knowingly touched S.G.'s breast for the purpose of his and/or her sexual gratification or arousal. See 720 ILCS 5/11-1.60(b) (West 2018); 720 ILCS 5/11-0.1 (West 2018). Respondent's challenge to the sufficiency of the evidence fails.

¶ 36                                    *Equal Protection Claim*

¶ 37    Last, respondent contends that his constitutional right to equal protection was violated. Respondent maintains that had he "been S.G.'s brother or cousin," he would not qualify as a "family member" under the aggravated criminal sexual abuse statute and could not be convicted of that offense. He would have been subject, instead, to the lesser offense of criminal sexual abuse, a Class A misdemeanor, with less stringent sex offender registration requirements. See 720 ILCS 5/11-1.50(b) (West 2018) ("A person commits criminal sexual abuse if that person is

under 17 years of age and commits an act of sexual penetration or sexual conduct with a victim who is at least 9 years of age but under 17 years of age."); 730 ILCS 150/3-5(c) (West 2018). In requesting that we reduce his conviction to that lesser-included offense, respondent argues that, as-applied, section 11-1.60(b) governing aggravated criminal sexual abuse treats him (an uncle only five years senior to S.G.) differently than similarly-situated individuals (such as cousins or brothers of his same age), in violation of the equal protection clause. See U.S. Const. amend. XIV; Ill. Const. 1970, art I, § 2. Specifically, he maintains the aggravated criminal sexual abuse statute unreasonably "exclude[s] both siblings and cousins from the definition."

¶ 38     Section 11-0.1 of the Code states "unless the context clearly requires otherwise," the term family member "means a parent, grandparent, *child*, aunt, uncle, great-aunt, or great-uncle, whether by whole blood, half-blood, or adoption, and includes a step-grandparent, step-parent, or step-child." (Emphasis added.) 720 ILCS 5/11-0.1 (West 2018). Section 11-0.1 of the Code continues, stating that family member "also means, if the victim is a child under 18 years of age, an accused who has resided in the household with the child continuously for at least 6 months." 720 ILCS 5/11-0.1 (West 2018).

¶ 39     We begin by noting that legislative enactments enjoy a strong presumption of constitutionality, and the burden then rests on the respondent to demonstrate the invalidity of a particular statute. *People v. Alcozer*, 241 Ill. 2d 248, 259 (2011). A reviewing court has the duty to construe a statute to uphold its validity whenever reasonably possible. *Id*. We review both the constitutionality of a statute and matters of statutory interpretation *de novo*. *Id*.; *People v. Shreffler*, 2015 IL App (4th) 130718, ¶ 17. When construing a statute, our primary objective is to give effect to the legislature's intent, which is best indicated by the statute's plain and ordinary language. *Shreffler*, 2015 IL App (4th) 130718, ¶ 18.

¶ 40      Here, reading the plain and ordinary language of the statute, as we must, the very premise of respondent's equal protection claim fails. Contrary to respondent's contention otherwise, section 11-0.1 of the Code does not exclude a "brother or cousin" of the same age from its scope. This is because the term "family member" can also mean a "child" or "an accused who has resided in the household with the child continuously for at least 6 months." 720 ILCS 5/11-0.1 (West 2018). As such, "a person" who commits aggravated criminal sexual abuse (an act of sexual conduct with a victim under age 18), can also be a child or someone living with the victim for at least six months, and this certainly encompasses a brother or cousin. See 720 ILCS 5/11-1.60(b) (West 2018) ("A person commits aggravated criminal sexual abuse if *that person* commits an act of sexual conduct with a victim who is under 18 years of age and *the person* is a family member." (Emphasis added.)). Section 11-0.1 involving statutory definitions also requires that we consider "the context" of section 1.60(b). With that in mind, the plain language of section 1.60(b) demonstrates it encompasses not just authority figures but those individuals with a familial relationship of trust to the minor victim. *Cf*. 730 ILCS 5/5-5-3.2(a)(14) (West 2018) (noting, a factor in aggravation at sentencing includes when "the defendant held a position of *trust* or supervision such as, but not limited to, family member as defined in Section 11-0.1 of the Criminal Code of 2012." (Emphasis added.)).

¶ 41      Based on the foregoing, respondent's constitutional claim fails before it even begins. *People v. Reed*, 148 Ill. 2d 1, 7 (1992) ("Equal protection requires that government deal with 'similarly situated' individuals in a similar manner."). We reach this conclusion without the benefit of fully-fleshed out arguments by the parties and the trial court because respondent did not raise his constitutional claim below. Regardless, respondent has failed to sustain his burden of establishing a constitutional violation.

¶ 42                              CONCLUSION

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 44    Affirmed.